# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEONARD C. GLENN,           :
                                   :
        Plaintiff,             :        Civil Action No.:   07-2195 (RMU)
                                   :
        v.                    :        Re Document No.:  11
                                   :
SHEILA C. BAIR, Chairman,        :
Federal Deposit Insurance Corporation,   :
                                   :
        Defendant.          :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case is before the court on the defendant's motion for summary judgment.  The plaintiff alleges that his employer, the Federal Deposit Insurance Corporation ("FDIC"), discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, by not selecting him for one of three vacant positions at the FDIC.  The plaintiff further alleges that his non-selection was in retaliation for prior EEO activity: specifically, his participation in a class action lawsuit against the FDIC and an e-mail alleging discriminatory practices.  The defendant now moves for summary judgment, contending that it chose not to select the plaintiff because the successful applicants submitted superior written application materials and performed better in their interviews.

Because the plaintiff has failed to raise a genuine issue of material fact as to the defendant's legitimate non-discriminatory reason for his non-selection and because no reasonable factfinder could conclude that the plaintiff's non-selection was causally connected to

his prior involvement in protected activity, the court grants the defendant's motion for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

Since 1975, the plaintiff has worked for the FDIC in the Division of Supervision and Consumer Protection.  Pl.'s Opp'n at 2.  At the time of his non-selection, the plaintiff was forty-nine years old, *id.*, and held the position of a Corporate Grade ("CG") -13 Bank Examiner at the Wayne, New Jersey Field Office of the FDIC,[1] Def.'s Mot. at 2; Pl.'s Statement of Facts ("Pl.'s Statement") ¶ 2.

On July 23, 2004, the plaintiff applied for a CG-13/14 Review Examiner rotational position, one of three available Review Examiner positions, in the Special Activities Section ("SAS") of the FDIC.[2]  Pl.'s Opp'n at 4.  The vacancy announcement for the position listed five Quality Ranking Factors ("QRFs"), or desirable knowledge, skills and abilities relevant to the position.  Def.'s Mot., Ex. 1 ("Vacancy Announcement") at 3.  The first QRF called for knowledge of rules, regulations and laws relating to the Bank Secrecy Act ("BSA"), the USA PATRIOT Act, the Bank Protection Act of 1968 and other relevant statutes.  *Id.*  The additional four QRFs listed as desirable characteristics the ability to communicate orally and in writing, to

---

[1]     To the extent necessary, the court relies on the undisputed factual assertions in the defendant's motion for summary judgment and the defendant's statement of facts.  *See DeMartino v. FBI*, 511 F. Supp. 2d 146, 151 (D.D.C. 2007) (holding that the "[p]laintiff does not contest, and therefore concedes, defendants' facts in support of summary judgment"); *see also* LCvR 7(h) (authorizing the court to treat the movant's statement of material fact as conceded if the non-moving party does not contest the facts in a motion for summary judgment).

[2]     Of the three available positions, one was a permanent position and two were five-year rotational positions.  Pl.'s Opp'n at 4.  The plaintiff applied for the rotational positions.  Def.'s Statement ¶ 3; Pl.'s Statement ¶ 3.

work with a broad range of people and to analyze information, identify problems and make recommendations. *Id.* Furthermore, in a section titled "Evaluation Methods," the Vacancy Announcement stated that applicants would be evaluated on the basis of the information in their "application package." *Id.*

In total, fifteen people applied for the positions. Def.'s Mot. at 5; Pl.'s Statement ¶ 9. Personnel Staffing Specialist Jerry Markham reviewed the candidates' written application materials, which included an application form, a list of accomplishments, a recent performance evaluation and a detailed narrative demonstrating what knowledge, skills and abilities each candidate possessed with respect to the QRFs. Def.'s Mot. at 5; Pl.'s Statement ¶ 9; Def.'s Mot., Ex. 2. Based on his review, Markham deemed all candidates qualified. Def.'s Mot. at 5; Pl.'s Statement ¶ 9.

Because the positions were designated as level CG-13/14, candidates previously working at the CG-12 level were permitted to apply as promotional candidates eligible for the CG-13 level. Pl.'s Opp'n at 3. Nine applicants fell into this category. *Id.* at 8. Pursuant to the applicable Collective Bargaining Agreement, a Merit Promotional Panel ("MPP") was convened, comprised of three individuals who reviewed the promotional candidates' written application materials. *Id.* The MPP referred seven of the nine promotional candidates for further consideration. Def.'s Statement of Facts ("Def.'s Statement") ¶ 13; Pl.'s Statement ¶ 13.

Six applicants, including the plaintiff, were at a CG-13 or CG-14 level at the time they applied, and were therefore eligible for reassignment or promotion without MPP review. Def.'s Mot., Ex. 3. Consequently, the MPP never reviewed the plaintiff's written application materials. Pl.'s Opp'n at 8.

On July 12, 2004, Markham forwarded the application materials of all thirteen qualified candidates – the seven promotional candidates who were referred by the MPP and the other six candidates – to Lisa Arquette, the Chief of SAS, who served as the Selecting Official for the positions. Def.'s Statement ¶ 14; Pl.'s Opp'n at 9. Arquette convened[3] a three-person interviewing panel ("the Panel") to conduct a preliminary round of structured interviews. Def.'s Statement ¶ 15. The defendant asserts that Arquette used an interview panel because she could not interview all the referred candidates personally due to her demanding schedule. Def.'s Mot. at 17 n.13. The plaintiff disputes Arquette's motive and authority for relying on the Panel, arguing that the procedure was inconsistent with FDIC hiring practices. Pl.'s Statement ¶ 15.

Andrea Winkler, Stephen Gaddie and Kenyon Kilber comprised the Panel. Pl.'s Opp'n at 9. Pursuant to the FDIC Structured Interview Guidelines, Def.'s Statement ¶ 19; Pl.'s Opp'n, Ex. 34 ("FDIC Guidelines"),[4] Arquette prepared four job-related interview questions, as well as benchmarks to evaluate the interviewees' responses, id.; Pl.'s Statement ¶ 19. The Panel posed the same four questions to each candidate, and each Panel member individually rated the candidates' responses. Pl.'s Statement ¶ 21; Pl.'s Opp'n at 11.

The Panel interviews took place on July 27 and 28, 2004.[5] Def.'s Statement ¶ 20; Pl.'s Statement ¶ 20. The Panel members used numerical scores to evaluate the candidates' interview

---

[3]     The plaintiff contends that Arquette "directly solicited the participation" of the Panel members. Pl.'s Opp'n at 9. The uncontroverted record, however, shows that although Arquette solicited supervisors from other divisions to provide a "resource" for the interviews, she did not select the Panel members herself. Def.'s Reply, Ex. 36.

[4]     In his opposition brief, the plaintiff appears to confuse these Structured Interview Guidelines, Def.'s Mot., Ex. 34, which governed the interview panel process, with the guidelines from the Merit Promotion Plan, which governed the MPP and the review of the promotional candidates' written applications, Pl.'s Opp'n, Ex. 14.

[5]     The plaintiff's interview took place over the phone because he was on assignment in Puerto Rico at the time. Pl.'s Opp'n at 36. Two other candidates, James Soja and Richard Liang, also had phone interviews. Def.'s Reply at 20; Def.'s Mot., Ex. 28 ("Gaddie Dep.") at 54.

responses and rated the candidates' responses as "outstanding," "good" or "inadequate" on the

Structured Interview Documentation.  Pl.'s Opp'n at 11.  Winkler and Kilber assigned

corresponding numbers ("3," "2" and "1" respectively) to each rating to calculate a numerical

score.  *See* Pl.'s Opp'n, Exs. 26, 27.  Gaddie also gave a numerical score based on what appears

to have been a "1" through "10" scale.  Pl.'s Opp'n, Ex. 30 (Structured Interview Documentation

("SID")).  Gaddie testified that he used numerical scores to jog his memory and to assess the

candidates against the benchmark for a particular question.  Def.'s Mot., Ex. 28 ("Gaddie Dep.")

at 42.  The Panel members then discussed their individual ratings and impressions of all thirteen

candidates and developed a consensus ranking.  Def.'s Statement ¶¶ 23, 24; Pl.'s Statement ¶¶

23, 24.

The plaintiff asserts that in ranking the candidates, the Panel focused on each candidate's

interview performance to assess his or her qualifications rather than taking the written

applications into account as well.  Pl.'s Opp'n at 11.  The plaintiff bases this assertion on the

statements of Gaddie and Kilber that they did not give serious consideration to the written

application materials,[6] the fact that the Panel did not receive the application materials until the

first day of the interviews and the absence of any notes regarding a review of the written

application materials.  *Id.*

On July 29, 2004, following the interviews, Gaddie forwarded the Panel's ranking of the

thirteen candidates to Arquette.  *Id.* at 12.  The Panel ranked the plaintiff tenth out of the thirteen

candidates.  Def.'s Statement ¶ 33; Pl.'s Statement ¶ 33.  During a telephone conversation,

---

[6]     In their depositions, Gaddie and Kilber testified that they both believed the written application
        materials were reviewed previously.  Gaddie Dep. at 33-34 (explaining that he believed the FDIC
        had a process that already screened applications for satisfying the Quality Ranking Factors);
        Kilber Dep. at 49 (explaining that he believed the application materials were reviewed as part of
        the threshold inquiry into which candidates were qualified for interviews).

Gaddie communicated to Arquette that there was a "clear distinction" between the top seven candidates ranked on the list and the remaining candidates.  Pl.'s Opp'n at 12.  Accordingly, Arquette decided to interview only the top seven candidates during the second round of interviews.  *Id.*  Arquette informed her supervisors Mindy West, Sandra Thompson and John Lane that she would be interviewing the top seven candidates only.  Pl.'s Opp'n, Ex. 29.  Initially, West responded by instructing Arquette to interview all thirteen candidates.  *Id.*  After her supervisors conferred, however, Lane subsequently emailed Arquette instructing her to interview only the group referred by the Panel.  *Id.*

The plaintiff maintains that based on the numerical scores given by the Panel, there was no "clear distinction" between candidates one through seven and candidates eight through thirteen.  Pl.'s Statement ¶ 32 (observing that Winkler's notes reflect that four candidates received a cumulative score of "10," four candidates received an "8" and five candidates received a "7").  Furthermore, the plaintiff argues that Gaddie's "clear distinction" remark regarding the Panel's rankings did not reflect the consensus of the entire Panel.  Pl.'s Opp'n at 12.  The plaintiff asserts that the only distinction between the top seven candidates and the bottom six was age; the top seven candidates were also the youngest candidates.  *Id.*

After interviewing the top seven candidates and reviewing their application materials, Arquette selected Tonya Spratley and Heather Basnett for the rotational positions and Eric Walker for the permanent position.  Pl.'s Opp'n at 14.  At the time of the selections, Spratley and Basnett were 33 years old, and Walker was 37.  Pl.'s Opp'n, Ex. 25.  Because the Panel ranked the plaintiff tenth out of thirteen candidates, Arquette did not interview the plaintiff nor did she give his application any further consideration for the Review Examiner position.  Def.'s Statement ¶ 35; Pl.'s Statement ¶ 35.

### B.  Procedural Background

Upon learning of his non-selection, the plaintiff timely filed a formal complaint of discrimination with the EEOC on September 30, 2004.  Def.'s Mot at 3.  After an EEOC Administrative Judge issued a decision in the FDIC's favor on May 15, 2006, which the EEOC's Office of Federal Operations affirmed on January 9, 2007, the plaintiff filed the instant complaint in the United States District Court for the District of New Jersey on April 11, 2007.  *Id.*  The case was transferred to this court on December 5, 2007.  On October 10, 2008, following discovery, the defendant moved for summary judgment.

## III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution.  *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

### B.  Legal Standards for Age Discrimination and Retaliation

### 1.  Legal Standard for Age Discrimination

To prevail on a disparate treatment claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009).  Assessing whether the plaintiff has met this burden, courts follow a three-part burden-shifting analysis known as the McDonnell Douglas framework.  *Lathram v.*

*Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)). By the time the district court considers an employer's motion for summary judgment, however, the employer ordinarily will have asserted a legitimate, non-discriminatory reason for its actions. *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 493 (D.C. Cir. 2008). In those cases, the question of whether the employee satisfied the first step of the *McDonnell Douglas* test is irrelevant. *Id.* "[T]he McDonnell Douglas framework . . . disappears, and the sole remaining issue is discrimination *vel non*." *Lathram*, 336 F.3d at 1088 (internal citations omitted); *see also Brady*, 520 F.3d at 494 (noting that "the prima facie case is a largely unnecessary sideshow").

Thus, if the defendant presents a legitimate, non-discriminatory reason for its actions, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable [factfinder] to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [age]?" *Brady*, 520 F.3d at 494. The court must consider whether the factfinder could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291. At all times, however, the plaintiff "retains the burden of persuasion" to prove, by a

preponderance of the evidence, that "age was the 'but-for' cause of the challenged employer

decision." *Gross*, 129 S. Ct. at 2351.

### 2. Legal Standard for Retaliation

To prevail on a claim of retaliation, a plaintiff must follow the *McDonnell Douglas*

framework. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003)

(applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *Duncan v. Wash.*

*Metro. Area Transit Auth.*, 214 F.R.D. 43, 49-50 & n.8 (D.D.C. 2003) (applying the *McDonnell*

*Douglas* framework to a Rehabilitation Act retaliation claim).  The Supreme Court explained the

framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence
> a prima facie case of [retaliation].  Second, if the plaintiff succeeds in proving the
> prima facie case, the burden shifts to the defendant "to articulate some legitimate,
> [non-retaliatory] reason for the employee's rejection" . . . .  Third, should the
> defendant carry this burden, the plaintiff must then have an opportunity to prove
> by a preponderance of the evidence that the legitimate reasons offered by the
> defendant were not its true reasons, but were a pretext for [retaliation] . . . .  The
> ultimate burden of persuading the trier of fact that the defendant intentionally
> [retaliated] against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted)

(quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in

a statutorily protected activity, (2) a reasonable employee would have found the challenged

action materially adverse,[7] and (3) there existed a causal connection between the protected

activity and the materially adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

---

[7]     In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of actions
than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C.
Cir. 2008).  Thus, "[r]etaliation claims are 'not limited to discriminatory actions that affect the
terms and conditions of employment' and may extend to harms that are not workplace-related or
employment-related so long as 'a reasonable employee would have found the challenged action
materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68
(2006)).

53, 67-69 (2006); *see also Scott v. Kempthorne*, 2006 WL 1980219, at *3 (10th Cir. July 17, 2006).  The plaintiff's burden is not great: he "merely needs to establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

If the employer successfully presents a legitimate, non-retaliatory reason for its actions, "the presumption raised by the prima facie is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citation omitted); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow").  Upon such a showing by the defendant, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable [factfinder] to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494.  In other words, did the plaintiff "show *both* that the reason was false, *and* that . . . [retaliation] was the real reason." *Weber*, 494 F.3d at 186 (alterations in original and internal quotations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).  The court must consider whether the factfinder could "infer [retaliation] from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were [retaliatory] or that the non-[retaliatory] justification was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case. *Aka*, 156 F.3d at 1291.

The strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-

retaliatory reason for the adverse action.  *See Aka*, 156 F.3d at 1289 n.4 (stating that "a *prima facie* case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment"); *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C. 2008) (holding that the plaintiff cannot establish pretext because "she is unable to show any causal connection"); *Meadows v. Mukasey*, 2008 WL 2211434, at *5-6 (D.D.C. May 29, 2008) (holding that the plaintiff demonstrated pretext in part by establishing a causal connection).  The plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity."  *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all").

### C.  The Court Grants the Defendant's Motion for Summary Judgment

#### 1.  The Plaintiff's Age Discrimination Claim

The defendant has asserted a legitimate, non-discriminatory reason for the plaintiff's non-selection: the plaintiff's interview performance and written application materials compared unfavorably to the interview performance and written application materials of the selectees.[8] Def.'s Mot. at 14-17.  Accordingly, the court foregoes an examination of the prima facie case

---

[8]    The plaintiff argues that the defendant has not satisfied its burden to articulate a legitimate, non-discriminatory reason because its proffered justification is not "specific, clear, and individualized."  Pl.'s Opp'n at 18-19.  The defendant's burden, however, is "one of production, not persuasion."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  The defendant need only articulate a reason and offer admissible evidence in support of that reason, *see id.*, which it has done here, *see* Def.'s Mot. at 14-17.  Moreover, this Circuit has held that basing an employment decision solely on applicants' answers during an interview is both reasonable and non-discriminatory and is sufficient to shift the burden back to the plaintiff.  *See Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996).

and turns to the central matter in dispute: whether the plaintiff has produced sufficient evidence for a reasonable factfinder to conclude that the defendant's asserted justification was not the actual reason for his non-selection and that the defendant discriminated against the plaintiff. *See Brady*, 520 F.3d at 494.

The plaintiff's evidence of pretext consists of the following: first, the plaintiff asserts that his qualifications were sufficiently superior to the other candidates to raise an inference of discriminatory motive, Pl.'s Opp'n at 19-20; second, the plaintiff suggests that the demographics of the SAS indicate a preference for younger employees, *id.*; third, the plaintiff contends that the circumstances surrounding the Structured Interview Process suggest that discrimination motivated the plaintiff's non-selection; *id.*; and fourth, the plaintiff argues that the Panel's ranking, in which the youngest candidates were ranked ahead of the older candidates, evidences discriminatory intent, *id.* The court addresses these contentions in turn.

### a. The Plaintiff's Qualifications

The plaintiff insists that based on the information provided in both his written application materials and interview responses, he was significantly more qualified than the selectees for the Review Examiner position when judged against the QRFs. *Id*. at 21-31. The defendant responds that the selectees were at least as qualified, if not more qualified, than the plaintiff. Def.'s Reply at 9-12.

The plaintiff faces a heavy burden in asserting his allegedly superior qualifications as evidence of pretext. This Circuit has held that "when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly* better qualified for the job' than those ultimately chosen." *Adeyami v. District of Columbia*, 525 F.3d

13

1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

As the Circuit made clear in *Adeyami*,

> The qualifications gap must be 'great enough to be inherently indicative of discrimination.'   Only then could the fact-finder 'legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination enters into the picture.'   In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'

525 F.3d at 1222 (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007); *Aka*, 156 F.3d at 1294).  In cases in which plaintiffs have successfully argued that their qualifications were so superior to the selected individual that a factfinder could infer that discrimination motivated the selection process, the difference in qualifications has been vast.  *Compare Jackson*, 496 F.3d at 707-08 (upholding summary judgment because the plaintiff and the selectee were both qualified for the promotion and there was no evidence that the plaintiff was a "discernibly better" candidate than the selectee) *with Aka*, 157 F.3d at 1295-99 (vacating summary judgment because the plaintiff, who had nineteen years of professional experience and multiple degrees relevant to the vacant position, was significantly better qualified than the selectee, who had worked for one year, had two months of volunteer experience and no relevant degrees).

In the context of promotional decisions involving government employees, the Circuit has held that

> pointing to differences in qualifications that merely indicate a 'close call' does not get [a plaintiff] beyond summary judgment.   [Courts] will not reexamine governmental promotional decisions where it appears the Government was faced with a difficult decision between . . . qualified candidates, particularly when there is no other evidence [of improper motive].

*Stewart v. Ashcroft*, 352 F.2d 422, 430 (D.C. Cir. 2004) (observing that "[b]ecause courts are not 'super-personnel department[s] that reexamine[] an entity's business decision[s],' we defer to the Government's decision of what nondiscriminatory qualities it will seek" in making promotional decisions) (internal citation omitted).

With respect to the first QRF, which concerned knowledge of the BSA and other federal statutes relating to bank fraud and banking industry crime, the plaintiff contends that unlike the selectees, he had performed highly specialized BSA and anti-money laundering ("AML") related assignments. Pl.'s Opp'n at 21-22. These assignments included a four-month detail to the Financial Crime Enforcement Network ("FinCEN"), a detail as Acting Special Activities Case Manager and an assignment to the Anti-Terrorist Financing Technical Assistance Program. *Id.* at 22. In addition, the plaintiff possessed over twenty years of experience examining institutions for BSA compliance and had reviewed problem institutions within his Field Office territory. *Id.* at 23.

Yet the evidence plainly demonstrates that the selectees also possessed significant experience with the BSA and related federal statutes. Spratley had eleven years of bank examination experience, during which she conducted BSA reviews and safety and soundness examination trainings for assistant examiners and foreign bank officials. Def.'s Mot., Ex. 15 ("Spratley Application") at 10-11. Similarly, Basnett had nine years of examination experience as both a state and FDIC bank examiner, had attended formal trainings and workshops pertaining to the BSA and had served as a BSA and Fraud Subject Matter Expert ("SME") for her field office. Def.'s Mot., Ex. 13 ("Basnett Application") at 4-5. Basnett also stated in her application that BSA examinations were a "regularly assigned duty" for her. *Id.* at 5. And Walker had ten years of examination experience, had trained other employees on the BSA, was a BSA SME for

15

his field office and had made a presentation on the BSA to bankers.[9]  Def.'s Mot., Ex. 16

("Walker Application") at 2.  Accordingly, the evidence does not support the plaintiff's

contention that he was significantly more qualified with respect to the first QRF.

 The second QRF stressed the "ability to communicate orally to gather information, make

presentations, relate findings and provide recommendations."  Vacancy Announcement at 3.

Regarding this QRF, the plaintiff cites his experience communicating with different offices and

agencies, his experience as a union representative and as a member of various EEO committees

and task forces and an award he received for a presentation he gave.  Pl.'s Opp'n at 26-27.  Yet

Spratley detailed her comparable experience participating in numerous meetings with bank

management, giving presentations and working as a recruiter.  Spratley Application at 10-11.  In

addition, Spratley conducted trainings for both safety and soundness examination procedures and

the GENESYS computer system.  *Id.*  Basnett also possessed oral communication skills, as she

had experience presenting examination findings, delivering presentations to office staff and

speaking to bank operations managers regarding BSA matters as part of a regulatory contingent.

Basnett Application at 5.  Walker noted his duties as a project manager, which included

conducting meetings with focus groups, giving numerous presentations at conferences,

conducting training sessions as well as presenting bank examination findings to Boards of

Directors and senior management officials.  Walker Application at 3-5.  Thus, the plaintiff has

---

[9]    The plaintiff points out that Walker's examination experience took place before the passage of the
USA PATRIOT Act, which altered the FDIC's examination procedures.  Pl.'s Opp'n at 25-26.
Walker, however, spent the years between 2000 and 2004 as a project manager developing the
VISION computer application upgrade, Def.'s Mot., Ex. 16 ("Walker Application") at 3, a
database which captures all the FDIC's BSA/AML examination data, Def.'s Mot., Ex. 17
("Arquette EEO Affidavit") ¶ 11.  Indeed, Arquette, whose division was upgrading to this system,
expressed the need for an individual in her section familiar with the new tool for managing BSA
examinations.  *Id.*  Walker's demonstrated technical expertise in BSA/AML compliance
examinations undermines the plaintiff's contention that he was significantly more qualified than
Walker with respect to the first QRF.

failed to show that he was significantly more qualified for the Review Examiner positions under the second QRF.

With respect to the third QRF – the ability to communicate in writing – the plaintiff refers to his ability to write quality examination reports and draft enforcement actions, as well as a specific report he wrote for an EEO advisory committee for which he received an award.  Def.'s Mot., Ex. 14 ("Plaintiff's Application") at 4; Pl.'s Opp'n at 28.  Spratley similarly referred to her examination reports as evidence of her strong writing skills, Spratley Application at 12, as did Basnett and Walker, Basnett Application at 5-6; Walker Application at 5-6.  Spratley listed additional examples of her writing experience, including performance evaluations and memoranda she prepared.  Spratley Application at 12.  Basnett referenced work paper narratives, summaries, progress reports and correspondence as examples of her regular written work product.  Basnett Application at 6.  Walker also cited numerous reports and analyses he had written for different technology projects on which he had worked.  Walker Application at 6.  These examples included documents that were circulated to senior management, Regional Directors and Field Office Supervisors.  *Id.*  Thus, the court cannot conclude that the plaintiff was significantly more qualified with respect to the third QRF.

As for the fourth QRF, both the plaintiff and the selectees demonstrated their ability to work with a broad range of people from different organizational backgrounds by citing the various professionals with whom they had worked during their respective careers at different state and federal agencies, officials at banking institutions and members of the public.  *See* Pl.'s Opp'n at 29; Basnett Application at 6; Spratley Application at 12; Walker Application at 6-7.  Accordingly, the plaintiff has not demonstrated his superior qualifications in this respect.

As evidence of his ability to analyze information to identify problems, make recommendations and present findings, as required by the fifth QRF, the plaintiff listed his successful examinations of large, problematic banking institutions and his detail to the Office of Diversity and Employment Opportunity ("ODEO"), which he also referred to in his interview. Pl.'s Opp'n at 30-31 & Ex. 30(a) ("Plaintiff's SID").  Beyond her experience as a bank examiner, Spratley had worked on the telecommunications team of the Shared National Credit Detail and as the SME for Examination Documentation and GENESYS for her field office.  Spratley Application at 13-14; Pl.'s Opp'n, Ex. 30(d) ("Spratley's SID").  Basnett also referred to her experience with on-site examinations, involvement in examinations of problem institutions, and during her interview, discussed her detail to the Atlanta Regional Office as Acting Case Manager.  Pl.'s Opp'n, Ex. 30(b) ("Basnett's SID"); Basnett Application at 6.  Walker similarly detailed his examiner background and discussed three additional details as a review examiner/case manager.  Walker Application at 7-8.  During his interview, Walker referred to the problems he had confronted while serving as project manager of a significant technology development project.  Pl.'s Opp'n, Ex. 30(c) ("Walker's SID").  Consequently, the plaintiff has failed to demonstrate that he was significantly more qualified than the successful applicants with respect to the last QRF.

Thus, although plaintiff emphasizes the qualifications that he amassed during twenty years of bank examination experience, Pl.'s Opp'n at 21-31, he fails to show that the gap between his qualifications and those of the selectees is substantial enough to infer discrimination, *see Adeyami*, 525 F.3d at 1222.  Indeed, it is undisputed that Markham deemed all candidates to be qualified based on their written application materials.  Def.'s Statement ¶ 9; Pl.'s Statement ¶ 9.  Each of the selectees had years of experience with the BSA and other banking laws as a

result of conducting bank examinations throughout their respective careers.  *See generally*

Basnett Application; Pl.'s Application; Spratley Application; Walker Application.  Similarly, the

selectees and the plaintiff all described their experiences giving presentations, writing reports,

interacting with other professionals, identifying problems and providing solutions during an

examination process as well as in other contexts.  *Id.*  In short, based on the written application

materials, the plaintiff and the selectees all demonstrated that they were well-qualified for the

positions.  *Id.*

Although the plaintiff selectively criticizes certain interview responses given by the

selectees,[10] Pl.'s Opp'n at 32-33, the SID strongly indicates that the selectees all gave responses

that demonstrated they were at least as qualified as the plaintiff.  *See generally* Pl.'s SID;

Basnett's SID; Walker's SID; Spratley's SID.

For instance, in response to interview question one,[11] the plaintiff explained the

challenges he faced in coordinating the collection of a large amount of information under tight

time constraints when working as a project lead on an annual diversity report for the ODEO.

Pl.'s SID.  The selectees, however, also provided similar responses detailing challenging

---

[10]   The plaintiff argues that the Panel arbitrarily and inconsistently ranked the candidates.  Pl.'s
Opp'n at 32.  The plaintiff's argument, however, consists of taking small snippets of the
selectees' written application materials and interview responses out of context and offering his
opinion of how these responses should have been rated.  *Id.* at 32-33.  This criticism does not help
the plaintiff meet his burden of showing that he was significantly better qualified.  *See Brown v.
Small*, 2007 WL 158719, at *7 (D.D.C. Jan. 19, 2007) (holding that "the plaintiff's assessment of
the candidates' qualifications cannot demonstrate a pretext for discrimination") (citing *Hammond
v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005)).

[11]   The Panel asked the following interview questions: 1) "Please single out that one assignment that
involved your most challenging working relationship.  Explain why it was challenging, how you
addressed those challenges and what you would do different in a future, similar circumstance;" 2)
"Describe a complex problem  . . . where you had to seek out relevant information, define key
issues, and recommend a course of action to achieve the desired results"; 3) "Please give an
example of a situation at your previous job when you had to keep up with rapid changes in your
field or work situation.  What did you do to adapt quickly" and 4) "Why do you want to work in
the [SAS]."  Pl.'s SID; Basnett's SID; Walker's SID; Spratley's SID.

assignments.  For example, Spratley described the challenge of learning new terminology and loan classifications when she was a member of the telecom team on the Shared National Credit detail.  Spratley's SID.  Basnett recounted her experience as Acting Case Manager in the Atlanta Regional Office and the challenges of responding to complex questions from bankers.  Basnett's SID.  And Walker discussed the difficulties he experienced as Project Manager when implementing the VISION computer application project.  Walker's SID.   Thus, the evidence does not suggest that the plaintiff provided a significantly better response to the first interview question.

Likewise, in response to interview question two, the plaintiff and the selectees gave similar answers explaining the challenges of a difficult bank examination each had performed. *See* Pl.'s SID; Basnett's SID; Walker's SID; Spratley's SID.  Spratley discussed a trust examination in which she found conflicts of interest in the bank's new hedging program. Spratley's SID.  Basnett similarly noted a complex examination she performed during which she suspected a national bank was flipping charters, and the bank's management was uncooperative in giving her the necessary information.  Basnett's SID.  Walker also described an examination he performed of a small bank that was invested in structured notes beyond the management's expertise.  Walker's SID.  The plaintiff gave a similar answer describing problems with a bank's management when he downgraded their rating after their examination.  Pl.'s SID.  Thus, with respect to question two, the interview documentation strongly suggests that each selectee gave a response at least on par with the plaintiff's response.

Similarly, the selectees and the plaintiff provided comparable responses to interview question four.  The plaintiff listed his FinCEN detail, AML task force and BSA experience as reasons why he thought he was a "good fit" for the position.  Pl.'s SID.  Spratley explained that

she wanted to work in SAS because she enjoys doing BSA work and is intrigued by law enforcement, AML and anti-terrorist financing procedures.  Spratley's SID.  Basnett also expressed her interest in SAS, adding that she was an SME in the area.  Basnett's SID.  Walker explained that he missed using his examiner skills and wanted to apply his knowledge of computer database systems to find answers to BSA questions.  Walker's SID.  Thus, the applicants' responses to question four do not reveal any obvious disparity in qualifications.

Indeed, where there was a distinction between the quality of responses, it was because the plaintiff's response was less impressive.  Specifically, in response to interview question three, Spratley described the challenges of being an SME for accounting, familiarizing herself with accounting standards so she could provide proper direction to others and applying these standards when examining a problematic institution.  Spratley's SID.  Basnett discussed the challenges in adapting to evolving issues as the SME for BSA, fraud, information technology and the GENESYS computer application for a small office.  Basnett's SID.  Walker detailed the VISION project and noted that he updated the system to keep up with changes in field operations and processes.  Walker's SID.  Each of the selectees provided detailed explanations of adapting to changes in their work environment.  *See* Spratley's SID; Basnett's SID; Walker's SID.  In contrast, the plaintiff gave a generic response regarding changes in the BSA examination process that provided no new information to the Panel about his qualifications.  *See* Pl.'s SID.  When comparing the plaintiff's response to question three to the selectees' responses, as reflected in the SIDs, the plaintiff's answer appears to have been markedly less detailed and repetitive of his answer to question two – indeed, the plaintiff received substantially lower scores from the three

Panel members for his response to question three than did the selectees.[12]  *Compare* Pl.'s SID *with* Basnett's SID; Walker's SID; Spratley's SID.

Thus, at most, the plaintiff has demonstrated that he and the selectees were equally qualified or that the difference in their comparative qualifications was close.  For the court to infer discrimination, however, the plaintiff must show that he was significantly more qualified such that the gap in qualifications is "inherently indicative of discrimination."  *Adeyami*, 525 F.2d at 1222.  The plaintiff has failed to meet this standard and show more than "slight questions of comparative qualifications," which do not warrant a trial.  *See Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005) (quoting *Walker v. Dalton*, 94 F. Supp. 2d 8, 16 (D.D.C. 2000)).  Therefore, the court defers to the "employer's unfettered discretion to choose among qualified candidates."  *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

In addition to asserting his superior qualifications, the plaintiff briefly argues that the Panel misjudged his qualifications, at least with respect to the first QRF.  Pl.'s Opp'n at 22-23.  Indeed, the plaintiff asserts that because he had significant experience with BSA- and AML-related assignments, the Panel must not have "recognize[d] the significance" or "ignored" or "arbitrarily disregarded" this experience, leading to "seriously credibility issues with respect to [their] assessment" of his qualifications.  *Id.*

As explained in *Aka*, a plaintiff is not "limited to comparing his qualifications against those of the successful candidate."  156 F.3d at 1295.  Evidence that indicates "an employer misjudged an employee's performance or qualifications is . . . relevant to the question whether its

---

[12]      Both Winkler and Kilber gave the plaintiff an "inadequate" rating for his response to question three.  Pl.'s SID.  Gaddie gave the plaintiff a 7.5 and a "good" for his response to question three.  *Id.*  The 7.5 score was one of the four lowest numerical scores given by Gaddie, three of which were scores for the plaintiff's responses.  Pl.'s SID; Basnett's SID; Walker's SID; Spratley's SID.  Both Spratley and Walker received two "good" scores and an "outstanding" for their responses to question three.  Spratley's SID; Walker's SID.  Basnett received three "good" scores.  Basnett's SID.

stated reason is a pretext masking prohibited discrimination." *Fischbach*, 86 F.3d at 1183. Yet, as an initial matter, there is no evidence in the record that the Panel ignored the plaintiff's BSA experience. In fact, the plaintiff's SID shows that the Panel took note of his BSA, AML and FinCEN assignments in their assessment of his responses to questions three and four during the interview. Pl.'s SID.

Moreover, knowledge of the BSA and other banking industry laws was only one of five QRFs listed in the Vacancy Announcement. Vacancy Announcement at 3. Even if the court were to credit the plaintiff's assertion that the Panel misapprehended the significance of his experience concerning that QRF, that fact would not raise an issue of fact with respect to pretext, as employers have discretion to place more emphasis on one desired characteristic when choosing among qualified candidates. *See Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) (explaining that "courts must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily") (internal citation omitted); *Stewart*, 352 F.3d at 430 (deferring to the "Government's decision of what nondiscriminatory qualities it will seek" when making promotional decisions).

Because the court concludes that the plaintiff has not shown that he was significantly better qualified than the selectees, the plaintiff's qualifications-based argument fails to raise an issue of fact with respect to the employer's proffered justification.

### b. Demographics of SAS

The plaintiff next argues that the composition of the SAS workforce constitutes evidence of pretext. Pl.'s Opp'n at 33-34. He observes that the selectees were 32, 33 and 37 years old, the outgoing Review Examiner was 37, the only Review Examiner in SAS at the time of the selection was 34 and the Selecting Official was 41. *Id.* Yet merely listing the ages of some of

the people who work within an office provides little evidence of age discrimination.  *See Whitener v. England*, 2006 WL 3755220, at *7 (D.D.C. Dec. 19, 2006) (explaining that "[i]t is well-settled that merely noting the composition of a workforce, without more, cannot sustain a discrimination action"); *Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) (stating that "evidence that merely indicates an underrepresentation of [a protected class] in the workforce does not itself establish pretext").  Although the plaintiff cites the ages of six SAS employees, he gives no indication of how many employees were employed by SAS, the ages of these employees or the statistical significance of an under-representation of older workers.  *See generally* Pl.'s Opp'n.  Thus, the plaintiff's passing reference to the ages of some SAS employees does not rebut the defendant's non-discriminatory reason for the plaintiff's non-selection.

### c.  Deviations from Standard Selection Practices

The plaintiff alleges that a discriminatory motive can be inferred from a number of irregularities in the selection process: the fact that Arquette did not participate in the Panel interviews, that the Panel did not thoroughly consider the candidates' written application materials, that the Panel interviewed the plaintiff by phone, that Arquette's supervisor improperly influenced the selection process and that the Panel did not fill out conflict of interest forms.  *Id.* at 34-41.  The defendant responds that the plaintiff has failed to offer evidence that the FDIC deviated from its standard hiring procedures and has only conveyed his preferences regarding how the process should have been conducted.  Def.'s Reply at 16-22.

The failure of an employer to "follow its own regulations and procedures, alone, may not be sufficient to support a finding of age discrimination."  *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982).  But a departure from procedure is a "factor that the trier of fact may deem

probative . . . in determining the true motivation behind the hiring decision." *Id.* The plaintiff cannot stop there, however, because it is "essential that [he] establish discriminatory motive." *Id.*; *see also Hamilton v. Paulson*, 542 F. Supp. 2d 37, 48 (D.D.C. 2008) (stating that "the irregularities, even if proven, must indicate discriminatory hiring practices") (internal citations and quotations omitted).

As an initial matter, the evidence strongly indicates that the selection process conformed to the FDIC Structured Interview Guidelines. *See* FDIC Guidelines (defining "best business practice" in FDIC hiring practices). Although the plaintiff insists that Arquette, as the Selecting Official, should have participated in the initial round of interviews, the Guidelines expressly permit a Selecting Official to utilize panel interviews. *Id.* at 2. Moreover, the Selecting Official can elect to have a panel conduct a preliminary round of interviews "to narrow down the pool of candidates for a final selection interview." *Id.* The Guidelines suggest, but do not require, that the Selecting Official "participate" in the panel.[13] *Id.* Thus, Arquette's decision to use the Panel to interview the candidates complied with the FDIC's best practices even though she did not participate in the Panel interviews. *See also Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 97 n.12 (D.D.C. 2008) (finding that the "[selecting official] did not breach FDIC policy by not sitting on the structured interview panel").

---

[13] The plaintiff argues that the clause "especially when coordinating large numbers of vacancies available nationwide," FDIC Guidelines at 2, specifies the only time when a Selecting Official may use an interview panel to narrow the pool of candidates, Pl.'s Opp'n at 35. Thus, the plaintiff contends that the use of a panel during this selection process was improper because there were only thirteen candidates for three vacancies. *Id.* This clause, however, does not transform the meaning of the term "should." Indeed, in context, the clause does nothing more than specify one situation when a Selecting Official's participation may not be possible, not the only situation.

Although the plaintiff argues that Arquette's explanation for not participating in the interviews – her busy schedule – is not credible,[14] Pl.'s Opp'n at 35-36, he fails to refute the fact that convening a panel to conduct a preliminary round of interviews is expressly authorized as a "best business practice" by the FDIC Guidelines, FDIC Guidelines at 2.  The court cannot infer a discriminatory motive from an asserted procedural irregularity when the defendant, in fact, adhered to procedure.  *See Johnson*, 679 F.2d at 922.

The plaintiff's next argument, that the Panel's reliance on interview performance to rank the candidates conflicted with the evaluation methods set out in the Vacancy Announcement, Pl.'s Opp'n at 37-38, also lacks merit.  The plaintiff has not presented any evidence that reviewing the candidates' applications at one stage in the selection process and distinguishing the candidates based on interview performance at a later stage is inconsistent with the FDIC's standard hiring procedure or represents a deviation from the evaluation methods in the Vacancy Announcement.  *See generally* Pl.'s Opp'n at 37-38.

Moreover, even if there were some evidence that relying solely on interview performance to rank candidates constituted a departure from procedure, the plaintiff has offered no evidence suggesting that the Panel's lack of attention to the candidates' written application materials evinces a discriminatory motive.  *See Hamilton*, 542 F. Supp. 2d at 48 (holding that any irregularities must indicate discriminatory hiring practices).  Indeed, this Circuit has explicitly observed that "selecting a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method

---

[14]     The plaintiff asserts that Arquette would arguably have been required to spend more time arranging two rounds of interviews than sitting in on an extra three hours of interviews for six more candidates.  Pl.'s Opp'n at 35-36.

of hiring a professional employee."[15]  *Fischbach*, 86 F.3d at 1183-1184 (noting that an applicant's written application need not be reviewed at every stage of the hiring process for the process to be reasonable).

Similarly, the plaintiff has offered no evidence that interviewing a candidate by phone departs from the FDIC's hiring standards.  *See* Pl.'s Opp'n at 37-38.  Nor has the plaintiff demonstrated how his being interviewed by phone is evidence that the defendant discriminated against him, particularly in light of the fact that the Panel interviewed two other candidates by telephone, *Id.* at 37-38 n.27, and ranked one of those candidates second, Def.'s Mot., Ex. 11. These facts greatly undermine the inference that the plaintiff was disadvantaged or discriminated against by having a phone interview.

Additionally, despite the plaintiff's insistence that Deputy Director Lane "inappropriately inserted himself into the selection process," he has offered no evidence demonstrating that Lane's involvement in the selection process constituted a deviation from procedure, or remotely suggesting how the deviation was discriminatory.  *See* Pl.'s Opp'n at 39.  Indeed, the plaintiff has not indicated how it was in any way "inappropriate" for Lane, as Deputy Director of the division, to respond to an e-mail query sent by Arquette, his subordinate.  *See generally id.* at 38-40.

---

[15]     The selection process assessed in *Fischbach* is instructive on this point.  In *Fischbach*, a personnel office reviewed applicants' written application materials and deemed ten applicants to be qualified.  86 F.3d at 1181.  Afterwards, a panel interviewed the ten applicants, and a Selecting Official selected an applicant based only on the scores given by the interviewers.  *Id.* at 1181-82. The Circuit described this process as "obviously reasonable."  *Id.* at 1184.  The Circuit noted further that there was nothing suspect about the interview panel giving less emphasis to the applicants' background credentials than it did to their interview responses, especially given that the panel "had the benefit of a prior determination that all of the interviewees were qualified."  *Id. Fischbach* strongly suggests that the selection process at issue here, which involved a review of written application materials to determine a pool of qualified candidates, followed by a preliminary round of interviews used to compare and refer candidates to a final round of interviews based on their interview performance, was also a reasonable hiring procedure.  *See id.*

Regarding the plaintiff's allegation that Arquette did not require the Panel members to sign conflict of interest forms, *id*. at 40-41, the plaintiff does not refute the fact that the FDIC Guidelines do not address the propriety of using conflict of interest forms, *see generally* Def.'s Mot., Ex. 34.  Although the plaintiff contends that the use of conflict of interest forms is required by a consent decree entered into by the FDIC, that consent decree expired in 2005.[16]  Pl.'s Opp'n at 42.  Therefore, because the FDIC Guidelines did not require the use of conflict of interest forms, the absence of such forms does not demonstrate that the defendant deviated from its standard selection practices.

In sum, the plaintiff has not demonstrated that the alleged irregularities in the defendant's hiring practices were, in fact, departures from FDIC's standard procedure or that they constitute evidence of a discriminatory hiring practice.  Accordingly, the plaintiff has failed to raise an issue of fact with respect to the defendant's proffered non-discriminatory justification.

### d.  The Results of the Interview Panel Process

The plaintiff lastly argues that the selection process was discriminatory and improper because the seven youngest candidates were ranked as the seven best candidates by the Panel and were selected to interview with Arquette.  Pl.'s Statement ¶ 49(f); Pl.'s Opp'n, Ex. 25 (listing the candidates' ages and their respective rankings).  The plaintiff cites this fact in the context of his argument that there is no "clear distinction" between candidates ranked one through seven and eight through thirteen.  Pl.'s Opp'n at 14.  The correlation between rankings and age, however, more clearly supports the argument that age must have motivated the selection process because it is unlikely that the seven most qualified candidates also happened to be the seven youngest

---

[16]     Although the plaintiff states the FDIC still follows the consent decree as a "best practices" model, Pl.'s Opp'n at 42, he offers nothing to support this assertion, *see generally id.* at 40-41.

candidates.  Although the plaintiff glosses over this correlation, *see id.* at 12, 14, this argument is perhaps his strongest evidence of pretext.

While this correlation provides some highly circumstantial evidence of discrimination, it does not, standing alone, raise a question of fact as to the defendant's asserted non-discriminatory justification.  Based on all the facts and circumstances, nothing about the interview process suggests that Arquette and the Panel did not seek the most qualified individual for the positions.  *Compare Hamilton*, 542 F. Supp. 2d at 51 (explaining that the "diversity of the interviewing panel, uniformity of the questions asked, and presence of the same interviewers at each interview bolster the Court's conclusion that the interviewing panel sought the candidate that was most qualified") (internal quotation and citation omitted) *with Allen v. Perry*, 279 F. Supp. 2d 36, 43-44 (D.D.C. 2003) (holding that a jury could question the "professed *bona fides*" of the selection process because the selections were illogical, only one of four criteria was used to arrive at the final rating score, the questions asked were not job-related and one of the applicants did not meet the minimum qualifications for the position).

The evidence concerning the selection process at issue indicates that the same Panel members conducted each interview, Def.'s Statement ¶ 15; Pl.'s Statement ¶ 15, the Panel asked the same questions to each candidate, Def.'s Statement ¶ 21; Pl.'s Statement ¶ 21, each question was job-related, Def.'s Statement ¶ 19; Pl.'s Statement ¶ 19, the Panel properly documented the interviews, Pl.'s Opp'n, Ex. 30, and the Panel ranked the candidates after discussing and sharing their impressions with each other, Def.'s Statement ¶¶ 22, 23; Pl.'s Statement ¶¶ 22, 23.  As discussed above, the general use of a panel to conduct a round of preliminary interview as well as Arquette's non-participation fell squarely within the FDIC guidelines.  *See* FDIC Guidelines at 2.  And although the plaintiff insists that the "obvious explanation" for Arquette's choice not

to interview all thirteen candidates herself is that she "wanted to remove [herself] from picking and choosing among a diverse and unfiltered pool of candidates," Pl.'s Opp'n at 36, narrowing the pool of candidates through the use of a preliminary round of interviews hardly suggests a discriminatory motive, *see Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 22 (D.D.C. 2009) (holding that the mere fact that two Caucasian candidates were referred to second level interviews, without more, was insufficient to raise an inference of discrimination because the plaintiff must have shown the employer acted because of his membership in a protected class).

Given the strength of the defendant's non-discriminatory justification and the absence of any other evidence of discrimination, no reasonable factfinder could conclude solely based on the rankings that the defendant discriminated against the plaintiff on the basis of his age. *Cf. Miller v. Lyng*, 660 F. Supp. 1375, 1380 (D.D.C. 1987) (holding that when "taken together with the other evidence and the lack of any real non-discriminatory explanation of the defendant," evidence that showed that individuals in their thirties were repeatedly selected for seven out of eight vacant positions over individuals in their fifties who were also considered and qualified for the positions supported the conclusion that the plaintiff was discriminated against).

Because the plaintiff has failed to raise a genuine issue of fact with respect to the defendant's legitimate, non-discriminatory reason for the plaintiff's non-selection, the court grants summary judgment to the defendant on the plaintiff's age discrimination claim.

### 2. The Plaintiff's Retaliation Claim

The plaintiff claims that the FDIC retaliated against him based on two past incidents of protected activity. Pl.'s Opp'n at 41-42. First, the plaintiff participated in a large employment discrimination class action against the FDIC referred to as the *Conanan* case, initially filed in

1993.[17]  *Id.*  Second, the plaintiff sent an e-mail to Arquette on January 4, 2004 ("the January

2004 e-mail") informing her that neither he nor the other African-American member of the Anti-

Terrorist Financial Assistance Task Force had been offered a foreign assignment.[18]  *Id.*  Lastly,

the plaintiff contends that an inference of retaliation against the plaintiff arises from the non-

selection of another employee with prior EEO involvement.  *Id.* at 43-44.

      The defendant asserts that even if Arquette knew of the plaintiff's January 2004 e-mail,

the Panel had no knowledge of the plaintiff's EEO activity.  Def.'s Mot. at 24-25.  Thus, there is

no reason to suspect that retaliation motivated the plaintiff's non-selection, as it was the Panel –

not Arquette – that eliminated the plaintiff from consideration.  *Id.* at 25-56.  Furthermore, the

defendant contends that the plaintiff's involvement in the *Conanan* case is too remote from the

non-selection to support an inference of causation.  *Id.* at 26.

      As previously discussed, the defendant has presented a legitimate, non-discriminatory

reason for the plaintiff's non-selection.  Def.'s Mot. at 13.  Accordingly, the court turns directly

to the dispositive question: whether the plaintiff produced sufficient evidence for a reasonable

factfinder to conclude that the defendant's asserted non-retaliatory reason was not the actual

reason and that the employer intentionally retaliated against the employee.  *See Brady*, 520 F.3d

at 494; *Laurent*, 544 F. Supp. 2d at 22 n.3 (concluding that the defendant's articulation of a

---

[17]    The plaintiff's individual EEO complaint, which he filed in 1997, was dismissed and subsumed by the class action, at which point he became a named plaintiff in the case. Pl.'s Opp'n at 41-42. The parties eventually settled the *Conanan* litigation under a consent decree in 2001.  *Id.* at 42.

[18]    Although the defendant briefly suggests that the January 2004 e-mail does not qualify as protected activity, Def.'s Mot. at 25, the e-mail contains allegations of discrimination against the African-American members of the Task Force in receiving foreign assignments, and thus likely does constitute protected activity.  *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (holding that "[n]ot every complaint garners its author protection under Title VII . . . the complaint must in some way allege unlawful discrimination, not just frustrated ambition") (internal citations omitted); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (finding informal protests of discriminatory practices, including complaints to management, to be protected activity).

legitimate, non-discriminatory reason for the plaintiff's termination also rendered an examination of the prima facie case of retaliation unnecessary).  At a minimum, the plaintiff must offer some evidence of a causal relationship between his involvement in protected activity and his non-selection.[19]  *See Cooke v. Rosenker*, 601 F. Supp. 2d 64, 79 (D.D.C. 2009) (holding that the plaintiff failed to raise an issue of fact regarding her retaliation claim because she failed to offer any evidence of a causal relationship between her involvement in protected activity and the adverse employment action); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000) (observing that the strength of the plaintiff's prima case is relevant to the analysis of the defendant's proffered non-discriminatory justification).

The plaintiff provides no direct evidence of a causal relationship between the protected activity and his non-selection.  *See generally* Pl.'s Opp'n at 41-44.  Even absent direct evidence, however, temporal proximity can support an inference of causation if the interval between the protected activity and the adverse personnel action is "very close."  *Clark County Sch. Dist.*, 532 U.S. at 271 (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985).  Courts generally construe "very close" to mean not more than three months.  *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 2001) (finding a three month period insufficient); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (explaining that the time span must be *under* three months to

---

[19]    Although the defendant argues that a causal connection is lacking because there is no evidence that the Panel members personally knew of the plaintiff's protected activity, Def.'s Mot at 24-25, this argument is foreclosed by the Circuit's recent decision in *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009).  Under *Jones*, on a summary judgment motion, the employer's knowledge of the protected activity is enough to raise an issue of fact as to whether the individual decision-maker knew of the protected activity.  *Id.* at 679.  Accordingly, the plaintiff's evidence that the FDIC knew of the January 2004 e-mail and his involvement in the *Conanan* litigation permits the inference that the Panel members individually knew of his protected activity.  *See id.*

establish temporal proximity alone and referring to three months as the "outer limit" of the temporal requirement) (internal citations omitted).

These authorities make clear that the three years that passed between the *Conanan* consent decree entered in 2001 and the plaintiff's non-selection in 2004 is too long a period to permit an inference of causation on temporal proximity alone. *See id.* Likewise, the six months that passed between the plaintiff's e-mail to Arquette on January 24, 2004, and his ranking by the Panel and subsequent non-selection in late July and early August is also too long an interval to give rise to an inference of retaliation. *See Buggs v. Powell*, 293 F. Supp. 2d 135, 148 (D.D.C. 2003) (noting that "[i]f a plaintiff relies upon temporal proximity *alone* to establish causation, the time span must be under three months") (internal citations omitted). Thus, temporal proximity does not suggest a causal relationship between the plaintiff's protected activity and his non-selection.

The plaintiff's only other evidence of retaliatory intent lies in the fact that Arquette failed to select another individual, Kimberly Patrick, who was ranked third by the Panel and also had participated in prior EEO activity. Pl.'s Opp'n at 44. The plaintiff contends that a trier of fact could infer from this fact that Arquette did not want candidates with prior EEO activity working for her. *Id.* Standing alone, however, this evidence is insufficient to raise an issue of fact that the defendant's asserted justification was pretext for retaliation. *See Puntillo v. Mineta*, 2009 WL 1424219, at *11 (M.D. Pa. May 19, 2009) (noting that evidence of retaliation against other employees may be admissible, but producing scant or weak evidence that would be probative of retaliation does not allow a factfinder to reasonably infer pretext). Indeed, the plaintiff has presented no evidence suggesting that Patrick was more qualified for the positions than the

selectees, nor has he presented any other evidence indicating that Patrick was passed over in retaliation for her prior EEO activity.  *See generally* Pl.'s Opp'n at 41-44.

Because the plaintiff has presented no evidence suggesting the necessary causal connection to support his retaliation claim, and the plaintiff's additional evidence could not lead a reasonable factfinder to find the defendant's non-retaliatory reason to be pretextual, the court grants summary judgment for the defendant on the retaliation claim.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 10th day of August, 2009.


RICARDO M. URBINA
United States District Judge